## MARK NORRIS *v.* ALANSON M. HURD *et al.*

Where a bill was filed to correct a mistake in the description in a deed, of land which had been surveyed and located, *but it was not sought to change the location,* and T. held a lot described in his purchase deed as bounded by such land, held that he need not be made a party, as his interests would not be affected by the decree.

A witness is presumed to be competent until the contrary is shown.

Where a defendant, against whom a decree was sought, was examined as a witness, his deposition was suppressed; and it was *held,* that the examination did not operate as a release, but that a decree might still be had against him, if warranted by other evidence.

Where a lot which had been surveyed, located, and platted on a diagram, was sold by an erroneous description, but the purchaser and all succeeding holders occupied it as marked out by the survey, a decree was made to correct the mistake, and releases were ordered to be made between the parties whose lands were affected by the erroneous description, to make their lots conform to the location.

THIS was a bill to correct a mistake in a deed of two lots of land in the village of Ypsilanti. It appears that, on the 29th of December, 1832, the complainant sold to Hurd the lots referred to, and gave him a bond for a deed. The lots were described in the condition of the bond as situate in the township of Ypsilanti, on the east side of the River Huron, directly south of, and adjoining a *highway* running east and west across the river, a few rods north of the mills then owned by Mark Norris and Timothy McIntire. The first lot was therein bounded as follows, viz: Beginning *north thirty degrees west, one chain and fifty links* from the northeast corner post of the headgate that lets the water from the east side of the dam, which supplies water to the aforesaid mills of Mark Norris and Timothy McIntire, to the saw-mill canal leading from said dam to Norris Wood's saw-mill, thence north sixty-nine de-

grees forty-five minutes east six chains and twelve links, thence south twenty-three degrees and thirty minutes east four chains, thence south sixty-nine degrees and forty-five minutes west four chains and eighty-nine links; thence north parallel to the centre of *said canal* to the place of beginning, containing by estimation two acres and thirty-two rods.    The other lot beginning *south sixty-nine degrees forty-five minutes west, seventy-nine links from the south-west corner of the first lot;* thence south sixty-nine degrees forty-five minutes west, three chains and forty-two links; thence north thirteen and a fourth degrees east, two chains and thirteen links; thence north forty-four degrees fifteen minutes east one chain and fifty links; thence south forty degrees east, two chains and fifty-eight links to the place of beginning, containing forty-nine hundredths of an acre. The two lots were separated from each other by a strip of land seventy-nine links wide for the *saw-mill canal;* the larger and first above described lot lying east of the canal, and the other west of it.    The alleged error in describing the lots in the condition of the bond, which error ran through all the subsequent conveyances, consisted in erroneously describing the beginning or northwest course of the lot lying east of the canal.    It was described in the condition of the bond as *north thirty degrees west, one chain and fifty links* from the northeast corner post of the headgate, that let the water into the canal, whereas the bill stated it should have been described as *north twenty-three degrees fifteen minutes west, one chain and fourteen links* from the northeast corner post of the headgate.    The several persons through whom the title had passed were made defendants, all of whom allowed the bill to be taken as confessed, except Timothy Showerman and Hiram Thompson, the then owners of the lots.    They filed a joint and several answer denying all knowledge of the mistake, to

which a replication was filed by complainant. The bill waived an answer under oath.

*Kingsley & Backus*, for complainant.

*C. W. Lane*, for defendants Showerman and Thompson.

THE CHANCELLOR. Before I proceed to the merits of the case, it is necessary to decide two or three preliminary questions.

1. It is insisted Jesse W. Taylor should be made a party. It appears from the evidence that complainant, in July, 1838, and soon after he had given a deed to Hurd, sold village lot No. 308, to Taylor, which lot is described in Taylor's deed to be bounded on the north by land deeded to Hurd. Taylor's lot lies south of the lot east of the canal. The lots sold to Hurd were surveyed and located by the parties long before Taylor purchased. The mistake in the deed to Hurd gives them a different location. It carries the north and south boundary lines about forty links north of their actual location, and the east and west boundary lines a little to the west; so that a correction of the error would not affect the interest of Taylor. It would only be correcting the deed, so as to make it agree with the actual location. If the object of the bill was to change the actual location of the lots, and to carry them further south, so as to take in a part of Taylor's lot, it would be necessary to make him a party; but as that is not the object of the suit, I cannot see he has any interest in it one way or the other. Besides, Taylor's deed does not refer to any particular deed, but describes his lot as bounded "north by land heretofore deeded to A. M. Hurd. By whom and when is not stated. He therefore was not go-

verned in his purchase by complainant's deed to Hurd, but by the location that had been made of the lots.

2. Two of the defendants, Compton and Thompson, were examined as witnesses by complainant, and it is moved to suppress their depositions. The bill is taken as confessed against Compton, and it does not appear from the pleadings and proofs by what kind of a deed he conveyed to Church and Showerman. If it was by a quit claim only, he would be a competent witness for either party. 1 *Cow. R.* 613; 2 *Stark. Ev.* 786. A witness is presumed to be competent until the contrary is shown. But complainant asks no decree against Compton, although he is a party to the suit, and his interest, if any, is adverse to the complainant.

Thompson is situated differently. He and Showerman are the present owners of the lots as tenants in common, and complainant asks a decree against them. His deposition therefore must be suppressed. But complainant may still have a decree against him and Showerman, if there is sufficient evidence left to warrant it. The rule on this subject is not as supposed by the defendants, that the examination of a party as a witness is an equitable release to him, so that a decree cannot be had against him, except on matters to which he was not examined. In *Thompson* v. *Harrison*, 1 *Cox Ca.* 344, the complainant executed a release to one of the defendants, and then examined him as a witness in the cause. In that case it was the *release*, and not the examination, that precluded the complainant from obtaining a decree against the other defendant who was only secondarily liable, the defendant who was examined as a witness, and who had been released for that purpose, being primarily liable. In *Massy* v. *Massy*, 1 *Beat. R.* 353, one of the defendants was examined as a witness on behalf of the complainant, but the case was

fully made out by the bill and answer. The Chancellor, adverting to the fact that the record made out the case, decided that the deposition might be suppressed, and a decree be made as if the party had not been examined. Chancellor Walworth, in *Bradley* v. *Root, 5 Paige R.* 637, says, " The reason of the rule that the complainant cannot have an adverse decree against a defendant as to a part of the case to which he has examined him as a witness, is, that it would be charging him upon his own evidence, which can only be obtained against himself by proper charges in the bill, and by calling upon him to answer in the usual way."

3. I have no doubt from the evidence a mistake was made, first in the bond and afterwards in the deed to Hurd, in describing the course and distance of the northwest or beginning corner of the east lot, from the northeast corner post of the headgate to the canal. The premises were surveyed and staked out by Pettibone, at or about the time the purchase was made, and before the bond was given, in the presence, and under the direction of complainant and Hurd, who agreed upon the starting point; and a diagram of the lots was made, showing the courses and distances, which, with the beginning corner, were also stated in writing at the foot of the diagram, with a blank left for the course and distance from the headgate to the beginning corner. The canal was dug at the time of the survey, and a pit prepared for the headgate, the timber for which was on the ground, and the blank was left to be filled up by the true course and distance to be ascertained after the headgate was erected. This blank, however, as appears from the diagram which is an exhibit in the cause, has never been filled. By what means the course and distance were ascertained when the bond was given, whether by survey or conjecture, does not appear.

There is no evidence of a change of location after the survey by Pettibone.   If any thing of the kind had taken place, it is highly probable a new survey would have been made, and that the stakes of the former survey would have been removed, and made to correspond with the new location.   That no change was made is evident from what afterwards took place.   The bond agrees with the diagram, in describing the east lot as situate directly south of, and adjoining a highway, clearly indicating that no part of the highway was to be included, one half of which would, however, be included under the erroneous description of the beginning corner given in the bond.   Hurd took immediate possession of the lots, and built a fence on the south side of them; and in building this fence, as well as one or two other fences, he was governed by the stakes placed in the ground by Pettibone when he made the survey.   Hurd always occupied the lots as surveyed; and there can be no doubt complainant supposed, when the bond was given, that he was selling, and Hurd that he was buying, the land that had been surveyed by Pettibone, and none other.   All who have owned and occupied the premises since that time, have occupied them according to the survey; and there is no evidence that any one of the defendants, when he purchased, supposed he was purchasing any other than the premises subsequently occupied by him.   Apple trees were set out, and a barn was built so near the south fence as to be excluded from the premises by the deed.   The question of a *bona fide* purchaser, therefore, does not arise in the case.   The complainant does not ask to take away any thing from Thompson and Showerman which they supposed they were purchasing when the premises were deeded to them.   Sage, Edmunds, Godard and Stuart, when they purchased, were shown the diagram of the survey made by Pettibone, and

it is to be presumed they were governed more by that, in making their purchase, than by the stake pointed out to them as the northwest corner of the east lot. Why was the diagram shown to them, if it was not a true representation of the property they were about to purchase? None of them supposed at the time they were purchasing any part of the highway. The deed to Edmunds, Godard and Stuart, describes the east lot as lying *directly south and adjoining the highway*, following the description of the premises contained in the bond to Hurd, which bond Sage saw at the time he purchased for his son.

On the west lot there is a furnace supplied with water from complainant's dam, and the bone of contention between the parties is not whether the east lot shall take in one half of the road to the north of it, but whether the furnace lot shall be carried about two rods further north, and nearer complainant's dam,—the southeast and beginning corner of the furnace lot being on the south line of the east lot, seventy-nine links westerly from the southwest corner of it.

A decree must be entered declaring the northwest or beginning corner of the east lot to be north twenty-three degrees twenty minutes west, one chain and ten links from the northeast corner post of the headgate that lets the water into the canal, (that being the true course and distance, as appears by a survey made since the suit has been pending,) and not north thirty degrees west one chain and fifty links from the said headgate, which last course and distance, instead of the first, were, by mistake, put in the deed from complainant to Hurd, and have been transferred from Hurd's deed into all the subsequent conveyances of the premises down to and including the deed to Thompson and Showerman. And Thompson and Showerman, by a quit claim deed reciting these facts, must release to

complainant such parts of the premises included in the aforesaid erroneous description as are not included in the corrected description; and complainant, by a similar conveyance, must release to Thompson and Showerman such parts of the premises included in the corrected description as are not included in the aforesaid erroneous description. The form of the releases, if the parties cannot agree, to be settled by a Master of this Court, and each party to pay his own costs, and be at the expense of drawing and acknowledging the release to be executed to the opposite party.